Thank you. Good morning, Your Honors. I'm Maurice Harmon, on behalf of the plaintiff in the lower court and the appellant here, DRK. This is a case about a serial copyright infringer that is asking you, as the panel, to help it escape liability with respect to nearly a thousand copyright infringement claims that have been asserted here. I say serial, I'm not... I just want to ask one question about how all this works, because it affects... It's the one thing I kept not seeing an answer to, though, I agree. I understand that these are non-exclusive... The ones we're talking about are non-exclusive licenses, in the sense that the photos can be licensed by other people, as well. The photographer can authorize other people to license them, as well as DRK, is that right? Correct. But once they're licensed, this is what I couldn't quite get, if it's licensed, McGraw-Hill, say, can McGraw-Hill then go get a different license for a different 20,000 volumes from a different agent or company, or once it's licensed, are they restricted to fulfilling that license? Well, I think that they could go get another license for additional use from somebody, not DRK, but they never did it. And what they did here is they got a license to copy or reproduce images for 40,000 copies, 100,000 copies, and then blew right past that limit and kept using the photographs over and over and over, beyond the limits. And it's fundamental law now, since New Kids on the Block, which is the most quoted case, said that once you become, once you infringe copyright or go beyond the license limits, you become a stranger, as a stranger to the licensor. Who holds that complaint? I'm sorry? Who holds that complaint? Well, we're here. Who are the actual owner of the particular item? Well, we would argue that the actual owner includes DRK, but also includes the photographer and, after Minden v. Wiley, anyone that gets, any entity that gets a right to authorize others, as exists here, without question, and I think it would be conceded by McGraw. Once that ownership interest attaches, then co-owners can bring the claims. That's the big difference after the 76 Act. But that requires agreement with the photographer, the owner of these images, to put that right? The right to authorize is implied in their understanding. It's not an overly sophisticated agreement, the representation agreements in this case. They're not as carefully drawn as Minden, the Minden-Wiley case, decided about a year and a half ago. So, but. What provision of your agreement with the actual owner of the right authorizes that? It's the. Impartially or otherwise. Yes, it's the part that says, I'm giving you photographs that you are going to sell or lease. And in this case, it's leasing. And the way it worked, as McGraw, I think, will concede, is that the photographs would generally, if not almost always, be licensed for non-exclusive purposes. So, they could license. So, DRK would license on behalf of the photographer an image to McGraw Hill. They might also license the very same image to Houghton Mifflin. But ownership before the 76 Act was singular. Now, the biggest change, and Minden recounts this and talks about it very clearly. Judge Fletcher says, in that case, that ownership can be divided up and chopped up. This is sort of why I asked the question I was asked to begin with. Because Minden certainly says some of this. And at other points, it seems to say other things. But, in other words, about what the limit of. But I don't really understand why this authorization right is different from the other right. If, as you say, they could go and get the same authorization from someone else for the same photo, then why is there a separate? How can you call that ownership when the statute specifically says that a non-exclusive license is not ownership? Well, a non-exclusive license by itself is not ownership. So, what. How is the representative agreement non-exclusive? Well, the representation agreement is not exclusive because it's not limited to. That is, the photographer did not limit to a single agency, DRK. It's a right to authorize. It did not provide a right just to the. But, importantly, and this may be different than Minden, the license isn't exclusive either. The license to McGraw-Hill. In other words, you're not restricting McGraw-Hill either in the way that you are authorizing them. So, that's also not exclusive. But it seemed in Minden to be exclusive. Well, it is. In fact, it does limit McGraw-Hill. And it is a non-exclusive license, which just means, as Minden said, as between the licensor, in this case DRK, and McGraw, McGraw cannot be sued for the use of that image in this case. As long as it's within the license limits. But the difference is McGraw did not get the additional right to authorize others to use that image. So, McGraw couldn't say to Houghton Mifflin, hey, we've got a great image. Wouldn't do it anyway, I suppose, because they're competitors. But we will license that image onto you. That's the critical part. Exactly. But conceptually, that's the difference between a non-exclusive license by itself. And what we have here is an ownership interest. That's what Minden says. After you get past six or seven, page six or seven, and what McGraw doesn't want to read, it says essentially a right to authorize is a 106 right. Once it becomes a 106 right and it's in the preamble to 106, then things have changed. Then you've conveyed a right under the Copyright Act under 106. That makes you an owner within a circle of ownership. For example, and as to everyone else who does not have that right, they can only use an image like McGraw within the limits of a non-exclusive license. Here we're saying, Minden says, that now within that circle of ownership, two important things. One is that only people within the circle of ownership have rights under 106. Maybe three important things. Second, now for the first time it's been articulated that the right to authorize, as well as any other rights you get, but the right to authorize is an ownership interest. And then the third thing it says that's very important is you could chop that up. You can give that right to authorize the original owner, as Your Honor is saying, Judge Hawkins, that could then, one ownership to start, but then those rights can be divided and you can convey to as many co-owners a right under 106 as you desire. So the fact that- Minden says that? Minden does, Minden Wiley. So it says because, again, those co-owners are within that circle of ownership. And vis-a-vis the world, everybody outside that circle has no rights unless they're granted a limited, non-exclusive right like happened here. So that's an important concept. And that's why Minden talks about sole ownership as not being a requirement anymore. And a very unfortunate thing happened in copyright, I think, from the framers of the statute called the rights under 106 exclusive rights because the ordinary connotation is that nobody else can have them, just one person. Can we focus on the assignment agreement? Yes. I'm just trying to figure out how you say the assignment agreement renders DRK a legal homework when it merely assigns the bearer right to sue, which seems to be violating silver. So can you talk to me about that? Yes. We disagree with that position, the bearer right to sue, because there's an assignment of copyright that's very clear and expressed. The only reason that it's been now in what we think are drive-by rulings, considered somehow that if you convey copyright title expressly in a written agreement, along with accrued claims, that somehow that only conveys a bearer right to sue, a pejorative concept after silvers used many times, that somehow that's what happened here. And it didn't happen here. Judge Alsep said it happened back in the very first Minden v. Pearson case that sort of started this ball of drive-by rulings. And then Judge Fella said it, relying upon, guess what, Minden-Miley, the district court, Judge Chen. And he relied upon Judge Alsep by collateral estoppel. I mean, but then we have Wright-Haven. Yes. Just drive-by ruling, whatever you mean by that. And I understand that the difference, if there is a big difference, being that you have other interests as well, copyright, not just the right to sue. So, I mean, but Wright-Haven did indicate that the appearance of a transfer of the copyright isn't by itself enough to go behind a rule, right? Correct. But neither did it say if you have an express transfer of copyright ownership coupled with an accrued claim, even if it's for the purpose of litigation, and there's nothing wrong with that, it's been tried to, McGraw in this case tries to cast that as. . . What did it say then? It seemed to me it did say that. And the difference here is that you also have something else that's hooked up to it, i.e. you have your own interest in this copyright, whether exclusive or non-exclusive. Absolutely. But also, the DRK was not set up to be a corporation to prosecute copyright claims. That's what happened in Wright-Haven. It wasn't set up to be a corporation to prosecute copyright claims. It was set up to be a corporation to license, to authorize the use of licenses and in order to implement that. In other words, they're one and the same. It's because you have this other interest.  of just going out and buying claims, copyright infringement claims. They had no other interest in copyright. None and no relationship. Not a relationship like we have here, where. . . It's the same point I was making. So, and the question is how does that hook up? First of all, as I understand it, on your Minden argument, by the way, we can keep going forward. This is a complicated one. Thank you. On your Minden claim, the assignment of the copyright doesn't matter. I mean, is that right? On your Minden claim. Minden-Wiley? Yes. It didn't matter, but it was stopped. So, it was precluded. But the court ended up saying, Minden court said, we don't have to go to that pillar. So, what I'm saying is, if you prevailed on that argument, we wouldn't get into the question of whether to transfer. Correct. There are three separate ways, it's our view, that you can get standing here. One is the express conveyance of legal ownership. And there couldn't be any doubt that on the face of the agreement, the assignment agreement, there's the conveyance, the transfer of legal ownership. I thought you said it was implied. No, in the agency agreements. That's the problem with these. Over here, we have the assignment agreement. Here, we have the agency agreement. And over here, we have a claim that beneficial ownership exists. So, those are two separate agreements. That's why I think it's so important, the distinction between what we have here and Righthaven. Righthaven didn't have another agreement way before they came up with this transfer scheme, as it's called. But DRK did. DRK had the representation agreements. Now, when you said the representation agreement was implicit, because it didn't use the word license, was it used the word lease? It didn't specifically say you have the right to authorize the issuance of licenses. But it said you had the right to lease it. Yes, and we say that means the same thing, but it's not as explicit. It's just an interpretation of the word. Yes. Correct, and does that mean you have a right to authorize? Because McGraw has a license. They have a license to use a lot of images, a thousand here. But they don't have the right to authorize anybody else to use those images. They only have a defense. If we went to them and they had used works within the license limits, they have a defense. They say, hey, we have a license. That's between the licensor and licensee. That's what that non-exclusive license gives them. And that's why this is different. Because whether it's a non-exclusive license or not, remember in Minden they didn't call the representation agreement a non-exclusive license or, I mean, an exclusive license. They said there was exclusive agency. But the most important part of that is that there was a right to authorize that was conveyed. And then the principle that's stated without question and necessary to the holding is that a right to authorize is now a 106 right, articulated by the circuit. For the first time, because no other circuit has addressed it, all these other cases have been district court level cases. I say drive-by rulings because in Reed Elsevier v. Muchnick about five years ago, the U.S. Supreme Court said, we have 200 cases that said registration was a jurisdictional requirement. But most of them were just repeating other cases. And then changed the rule. No, different one. Second Circuit appeal was argued in February. We are still waiting for ruling. We made a motion there because this case is ahead of that case chronologically. And asked that the Second Circuit stay the briefing schedule. You're exactly right. They didn't have to do that. But we alerted them to this potential. Thank you very much. We'll be right back. Okay. Thank you. May it please the court. My name is Christopher Beal. I represent the Appellees Monroe Hill Global Education, Monroe School Education Holdings. Judge Berzante, it's your question about what makes this, whether this is an exclusive or non-exclusive license. The representation agreement. I understand that. That is what I was asking. I was asking whether the agreement between McGraw-Hill and TRK is exclusive in the sense that McGraw-Hill go off in license. The answer is depending on the terms of the license invoice arrangement that TRK conveyed to McGraw-Hill. Yes, McGraw-Hill can license others. I want to ask whether that. So to give you an example, McGraw-Hill purchases the right from TRK to use photos in textbooks. McGraw-Hill then licenses purchasers of those textbooks to use those photos online in professors' PowerPoint displays. It licenses third parties to use those final photos through McGraw-Hill's transaction. So McGraw-Hill acquires an authorization to license. That's interesting. What I meant was if McGraw-Hill licenses from TRK to have 20,000 reproductions of this, could it then go to somebody else and for the same textbook get another 20,000? If the same photo is available from another agency, and many of these are. So in this scenario, TRK represents a photo. That photo is also being represented by Getty. McGraw-Hill could, didn't, but could go to Getty and acquire an invoice for additional use. So scanning and safe making applies to all of us. Minden stands for the proposition that in order for a photo agency to have scanning, the photo agency must be an exclusive agent of the photographer. Minden defines exclusive as horizontally exclusive, i.e., with the authority to authorize, and not, I mean, vertically exclusive but not horizontally exclusive because it says the fact that the photographer or somebody else also has that right doesn't matter. I agree that that's what it says. I think the Minden decision is intentioned with the Silver's decision. Oh, look at that. Okay. Yes. Your Honors, I believe that you construe Minden to stand for the proposition that as between a photo agency and the world, if the photo agency has the exclusive right as against the world, then the photo agency has standing. Exclusively against the world, meaning that's what Minden, and why is that not true here? Because TRK did not have exclusive representation of its photographers and that its photographers did authorize others. But Minden specifically says that because of the, that if the photographer retained the right to authorize or somebody else, you said or somebody else? Specifically said that? It did say or somebody else. The answer, Your Honor, is that under the facts and the record in the Minden case, Minden, it was uncontroverted, was an exclusive agent of the photographers, and that its exclusivity as an agent meant that it controlled, it was an owner of the rights as against the world. It indicated that, the court indicated in Minden, that the photographer and the photo agency, the fact that the photographer could engage in licensing, did not eliminate the fact that Minden was an exclusive agent and therefore Minden owned exclusivity as against the world. TRK submitted affidavits from the photographers who said in those affidavits that they intended to part with ownership in copyright. So I guess my question for you is, why don't those affidavits create at least a tribal issue of fact about the effect of the assignment agreement? The answer is, those affidavits are exactly what the right-hand organization submitted in the Righthaven case, saying that the parties intended to create a transfer of ownership, and the court in Righthaven held that those assertions of intent are not dispositive, nor even a fact issue. Righthaven was decided on summary judgment. What the court in Righthaven said is that judges have to look to the substance and effect of the party's relationship to understand whether, in fact, there has been a transfer of ownership, as opposed to just an intention expressed after the fact. The answer is, I can't explain that script. I don't like it. Well, it's not a question of like. I believe that the script is in conflict with clear congressional expression throughout the Copyright Act, which makes a fundamental distinction between exclusivity and non-exclusivity. In the definitions of ownership, exclusive ICCs are indicated to be. Right, but what this seems to be saying is that the authorization right is somewhat different, because it gives you a right down the line. It's not just a right to use it yourself, but to, as against the world, control other people's rights. I understand that that loss can be read into the panel's decision in Minden. I would submit, Your Honors, that that loss is highly inconsistent with prior case law in this circuit, and that that loss is fundamentally inconsistent with right-handed silvers. Silvers, and Your Honors, Judge Hawkins' decision in Warren versus Fox Family, and actually Your Honors' decision at the trial court level in Giddings versus the case about paintings. And your dissent in silvers. And I would submit, Your Honor, that your dissent in silvers would not save DRK here. DRK was not the creator of the photos, but that's what your dissent suggested is that a creator could still have standing. And where Your Honor was coming from was that the purpose of the Copyright Act is to enable creation of content, and that it seems appropriate to allow the creator to enforce the copyright. In this context, it's not a creator who's enforcing it. It's an agent. So tell me why we haven't really been talking about the transfer much. We've been talking about the post-temporary ownership. But on the transfer issue, the fact that the statute specifically says that the fact that the ownership is temporary doesn't matter. That's right. So that can't be anything if you emphasize that. So what is it that makes this? DRK has some kind of an interest in this, unlike Righthaven in these photos, whether you call it non-exclusive or exclusive under Minden or whatever. And so when it's getting the transfer or the purported transfer, it does have its own interest somewhere behind there, unlike Righthaven, which has none. Well, I would beg to differ that unlike Righthaven, Righthaven had none. Righthaven had the power under the Strategic Alliance Agreement with Stevens Media to enter into licenses for the purpose of settling claims. Those licenses or those settlements were licenses authorizing past use and potentially authorizing future use. And, therefore, Righthaven was exactly like DRK, and exactly in the context where there was a document that, on its face, suggested there has been a transfer of ownership. And behind that document was a prior agreement, and the prior agreement controlled. And the prior agreement said, we're going to have an exclusive license back to the Review-Journal, and we're going to do all these things, and we can settle claims, and we're going to divide royalties. Here's the reason why. The assignment document in the DRK case is not actually a transfer of ownership, and it's only a transfer of bear right to sue. It didn't change the representation agreement. It didn't say, and we're not going to do licensing anymore, where we provide you with proceeds from our licensing. In fact, DRK did continue to do licensing and treated its invoicing with third parties as pursuant to the representation agreement. And the representation agreement was non-exclusive. And therefore, what DRK was doing was saying, we have this assignment document. The assignment document purports to transfer ownership, but we're going to continue to behave as though the representation agreement still controls, and we're going to issue invoices, and we're going to pay royalties, and we're going to do business under the representation agreement. Why couldn't the royalties just be payment for the transfer? I'm sorry, why couldn't the royalties? Why couldn't it just be a way of paying for the copyright? The assignment agreement that DRK entered into with the photographers expresses only that there will be a sharing of revenue from settlements. The assignment document, which is quoted in full by Judge Rosenblatt, says we're going to transfer ownership for the purpose of registering and pursuing claims. And if we obtain proceeds from settlement of claims, we're going to split after attorneys 50-50. That's the only sharing that happens under the assignment agreement. But in fact, what was going on with DRK was they were continuing to issue invoices, licenses, and they were sharing revenue. Why were they doing that? They were... It certainly wasn't the same 50-50, although there were attorneys facing costs. But the real problem here is DRK was the owner. The assignment agreement transferred all right and title in the copyright, which meant that DRK didn't need to share to the photographers. They were the owners. They were paying for the transfer through the opportunity to pursue litigation and the opportunity to then share the proceeds of litigation. They weren't paying for the transfer through invoicing licensing agreements, licensing arrangements with end users. The numbers are the same. It's not the same in terms of... Well, the answer is it's 50% of an invoice is different from 50% of a settlement. The 50% in the invoice is still a contingent 50%. Contingent on them actually getting a recovery, right? No. I'm confused. I don't believe it's contingent. I don't believe Your Honor's confused. The answer is that what happens in the business, DRK receives a request from a publisher, the publisher wants to use a photo. The publisher says... And they're saying that's for the first license, not for any infringement. That's correct. It seems that beneficial ownership is an equitable doctrine. It is. So could we hold that DRK is a beneficial owner based on the financial stake that it had in these photographs? That's exactly what Judge Hawkins decision in Fox Family Entertainment held that it can't. That decision, Warren v. Fox Family Entertainment, was a situation much like Judge Berzon's hypothetical under dissent of a right to... I'm sorry, a work-for-hire author who is sharing proceeds from the work but is not an owner of the work because it was work-for-hire and therefore wasn't an owner. The argument was made that the work-for-hire author is a beneficial owner because that person is receiving money in the same way DRK is receiving money. The court held that that was not a beneficial owner, that the standard for beneficial ownership is someone who was an author and parted with the ownership in exchange for receipt of revenue. DRK was never the author. Therefore, DRK cannot be the beneficial owner. Your Honors, out of time, I would only conclude by saying we believe Judge Rosa Blatt was correct and that in order to hold for DRK, this court would have to set aside the right... Can you talk a little bit about the practicalities of this event? It seems to me that the Alaska case amended or being driven somewhat by the practicalities of this, that if TRR were right, then essentially is there any practical way to enforce this? In particular, is there a contract that could be enforced? Well, certainly DRK has a contract. It has the invoicing transactions with McGraw-Hill. I want to... One of the issues, preemption issues, was enforcing copyright contracts. There is, absolutely. If the contract is merely a contract for the payment of making copies, the kind we would argue in the Second Circuit is so-held. But I want to... Therefore, is it questionable whether it could enforce a contract? If there has been and there was a contract between DRK and McGraw-Hill, then DRK, that is in addition to or beyond merely authorization to make copies... That's simply because that's what it's for. It's for the authorization to make copies. There was an agreement in place with DRK around pricing terms. It was overarching for certain periods of time. I need to step back and make a point about practicalities because Your Honour is correct that in Alaska stock and in Minden, the panels point to practicality. First off, we don't have it in the record, but I would suggest, Your Honour, you could take judicial notice of the fact that Mr. Harmon and his firm have brought about 140, 150 of these kinds of cases. Seventy-six of them have been on behalf of individuals. It is simply not true that individuals cannot enforce their copyright. In fact, the vast majority of the cases that Mr. Harmon's firm is now bringing are individual photographers based on individual transactions across many agencies. And so it just isn't true that it is practically difficult to enforce copyright by an individual. Moreover, that's what Congress created, the registration regime that allows for statutory damages and costs. If the photographer obtains a copyright registration or somebody obtains a copyright registration and the registration is in place before the infringement commences, statutory damages and attorney's fees are available. It's also true that according to the Copyright Office, I don't know whether you speak challenge, there is no problem with their having bid the registration, having done the registration. The Ninth Circuit should be so helped, yes. There is a district judge in the Second Circuit who disagrees, and Mr. Harmon and I are familiar with that one. I gather you guys have a long history. We have a long history. Thank you very much. Thank you. Well, there's a lot of brush to clear, and I'm not sure you're going to let me do it all. Well, they would love that because what's happened here in a practical sense is McGraw-Hill has saved hundreds of thousands of millions of dollars of licensing fees. So they would love nothing more than to say, they will pay $100 or $50 or $200 for additional licensing fees under the contract. And they understand that they've been able to keep that money for years and years and years. Essentially, if they don't. Does that have to be arbitrary? Perhaps. It depends on the agreement. But, yes, that's some of them. Is there a preemption problem with those in such cases? Say that again. A preemption problem in such cases? There's not. Early on, McGraw and others challenged these actions and said they're not copyright infringement cases. These are breach of contract cases. Ordinary. With a breach of contract case? If you thought it was a breach of contract case, would there be a problem? There would be no problem except that the damages are tiny compared with copyright. And courts have said for a long time now, these are not contract cases. When you go beyond a license limit, it's not a breach of a contract. You had the right to use the images 40,000 times. You had to pay for that. Well, they did that. Once you go beyond the contract, new kids in other cases have said, you're in copyright infringement territory. And, therefore, you can't break the contract cases, I understand. Maybe. They don't say that, but nobody wants to. Let's be real. There's even tinier damages at stake. And Mr. Beal. Thanks. I just have one question. It seems like Perot challenged standing in the answer at the case management conference, but your client didn't do anything to him and the complainer had the photographers. So I'm trying to figure out how that was diligent. Well, certainly the approach that made the most sense, as Minden says very clearly in the last page of that decision to bring these claims in one group with DRK pursuing them, we believed and still believe is the better approach to vindicate the Copyright Act and what the Copyright Act is intending to accomplish. And so you're right. Early on in the case, we got on the horse, standing horse, and stayed on it. And to this day, we think that that's appropriate. But if it wasn't, then what's wrong with permitting an amended complaint to bring in the individual photographers? Couldn't you just file them tomorrow with the individual photographers? We could if we could aggregate them all. What I'm saying is what's the difference whether they came in this case or it was a different case? Well, one of the differences is Mr. Appeal will immediately file a motion for summary judgment saying the statute of limitations has expired. And say somehow, you know, because this case was brought to SDRK and now, you know, whatever time has elapsed. Pardon? In other words, the particular infringements you're talking about are sufficiently in the past that there would be a limitation. Yes. Because this is. I don't understand why you waited. I mean, just as a backup, I don't understand why you didn't have the photographers. Because it was our view that the case that should be brought would be one case under DRK who we believe has the right with respect to their business arrangement and relationship with photographers and had the assignment of the copyright title. And that that was sufficient and contrasted with the difficulty of having, in this case, I think it's close to 100 photographers be brought individually against DRK. This is a very large case. And I just would like to say one other thing. My apologies. Mr. Peel and I tried a case in Philadelphia, GHPI, another photo agency, to a jury. And that jury found that this particular textbook, actually to be absolutely correct, following the jury's decision that all 53 claims of copyright infringement were valid and assessed damages, this Bellwether case. The court in post-trial motions trying to figure out damages requested our positions and McGraw-Hill admitted to over 1,000 infringements in that case, separate infringements in that case in Philadelphia. Well, guess what? One of the books that they admitted, they printed 536,000 times. Even though they had licenses for 100,000, is the very book that DRK licensed images, all of those yellow tabs, for 100,000 copies only. So here's a great example of what they're asking this court to do. And that is to throw out, we contend, is the only efficient and effective way to bring this case so that they escape liability for. That you certainly could have brought a case if we could have rounded all of them up. Not another efficient way. And that's what Minden said. The same argument came up in Minden by his firm, by Mr. Beal's firm, a different lawyer. And they contended that, you know, this is how it could have happened.  And do they, is that what vindicates the Copyright Act and what the Copyright Act is trying to do? Which is to protect creative work. And does that comport with Federal Rule 1 that says adjust an efficient and speedy determination of cases is what we should be striving for? Thank you. Thank you very much. Thank you both for continuing the saga together. I have a case that we are in. I'm not going to go into specifics. I'm going to talk about other subpoenas.
judges: Hawkins, Berzon, Murguia